ALUMINUM, Inc., v. RECONSTRUCTION FINANCE CORPORATION.

No. 3148.

Circuit Court of Appeals, Tenth Circuit.

Nov. 5, 1945.

Eugene L. Bleiweiss, of Cleveland, Ohio (Irvine, Skeen & Thurman, of Salt Lake City, Utah, and Payer, Bleiweiss & Mollison, of Cleveland, Ohio, on the brief), for appellant.

Parnell Black, of Salt Lake City, Utah (Rawlings, Wallace & Black and B. E. Roberts, all of Salt Lake City, Utah, on the brief), for appellee.

Before PHILLIPS, BRATTON and HUXMAN, Circuit Judges.

HUXMAN, Circuit Judge.

The Reconstruction Finance Corporation[1] instituted an action in the United States District Court for the District of Utah against Aluminum, Inc.,[2] to recover judgment on two promissory notes and to foreclose a mortgage given as security therefor. The first note was for $50,000 and the other was for $775,000. On the latter note, the RFC asked judgment for only $10,108.92, the amount which it had advanced thereunder. It was not claimed that the money advanced under these notes had been repaid. The answer of the Company denied that the RFC was entitled to any judgment by reason of the counter-claim filed by the Company. By its counter-claim the Company sought judgment against the RFC for damages suffered as a result of an alleged breach of contract by the RFC, in the sum of $1,142,560. The loss for which the Company sought judgment in its counter-claim was an alleged profit which it claimed it would have

realized under a contract with the Metals Reserve Company for the sale of alumina had it not been for the alleged breach by the RFC. The trial court dismissed the counter-claim and entered judgment for the RFC in the amount prayed for, and for the foreclosure of the mortgage, and the company has appealed.

At the outset, we pause to say that appellants have violated every rule of this court in the preparation of the record. Having obtained permission to file typewritten copies of the record, the appellants merely filed the official reporter's transcript of the proceedings of the trial— five hundred seventy-eight pages of the testimony, in question and answer form. In addition, they filed a volume of all the pleadings, motions, and other proceedings in their entirety. They also filed another volume consisting of a large number of exhibits, without any index or without any other way of locating or identifying any exhibit therein. In other words, they dumped the entire record in our laps and asked us to do their work for them by requiring us to go through this labyrinth and abstract and search out what is necessary for a consideration of the questions presented, and separate it from the chaff. The appeal might well be dismissed for the dereliction of the parties in this respect, but in the interests of justice and a speedy determination of the issues, we have attempted to perform the additional work required by the condition of the record. We only hope that in the time available we have succeeded.

The facts out of which this controversy arose are substantially these: The Company owned some mining claims, a plant site, and some buildings and equipment at Marysvale, Utah. The claims contained large deposits of alunite ore. In June, 1939, the Company obtained the $50,000 loan from the RFC, and gave a mortgage therefor on its property. It agreed to repay this loan at the rate of $5,000 a year, beginning one year from the date of the loan, and agreed to pay the entire balance thereof in five years from the date of the loan. No principal payment was ever made on this loan, and only one small payment of interest, in the sum of $380.82, was paid thereon. The Company also failed to pay the taxes on the property for the years 1941 to 1943, both inclusive.

[1] Herein called the RFC.

[2] Herein called the Company.

In June, 1942, the Company made application to the RFC for an additional loan of $800,000, for the purpose of erecting a plant capable of producing 70 tons of alumina per day. This application was subsequently revised and changed to $775,000. In the revised application, the Company proposed to erect a plant which would produce 40 tons of alumina per day and would cost $480,000. The balance of the amount asked for was for working capital. The application had attached thereto a letter of The Dorr Company,[3] an engineering firm, stating that at the Company's request it had made a preliminary investigation and had prepared preliminary flow sheets which indicated that with the material on hand and with what was available and with what the Company had told them it had available, it was of the opinion that the plant could be constructed for approximately $480,000, and that it was willing to undertake the construction. The Company also attached to its application a copy of a contract with the Metals Reserve Company for the purchase of alumina at $50.00 per ton.

On May 4, 1943, a conference was held by representatives of Dorr, the Bureau of Mines, and RFC, for the purpose of considering the feasibility of the project, including its cost. Mr. Dean, of the Bureau of Mines, discussed in detail the Moffat process which was to be used by the Company in the production of alumina, and stated that he thought it would work and that he thought the plant could be constructed for $480,000. Dorr stated that it was ready to go ahead and carry through the construction and the first few months of operation, but it was unwilling to put its name to a cost estimate except in a very preliminary way. The Bureau and Dorr were to present an estimate in writing of the cost nature of the product, and, if possible, an estimate of the cost of the plant. On May 6, 1943, engineers of the Bureau of Mines stated to S. H. Husbands, an RFC director, that in their opinion the process was feasible, that they had inspected the equipment, and that it was their opinion that this equipment, together with additional items to complete the flow sheet, would permit the construction of a plant with a daily capacity of some 20 to 30 tons per day, and that it might reach 40 tons per day. He stated that it would take $480,000 to complete the facilities and that unexpected contingencies should not increase this amount more than $100,000.

Thereafter, the RFC, on May 13, 1943, adopted a resolution conditionally authorizing the loan of $775,000. The conditions set out in the resolution necessary to consider are substantially these: Not more than $480,000 of the proceeds should be used for the payment of the cost of equipment and the construction of the plant; the Company was required to engage the services of the Bureau of Mines for advice on construction and operation; prior to the first disbursement on the loan the RFC agency manager at Salt Lake City was to be in receipt of a written statement of the Chief of Engineers of the Self-Liquidating Section of RFC that he was in receipt of evidence satisfactory to him that the Company had a sound commitment to obtain necessary equipment, machinery and supplies in good used condition, or that priorities acceptable to the Chief Engineer had been obtained for such new equipment and supplies as might be necessary for the construction and operation of the plant; that the Company's contract with Dorr was to be approved prior to its execution by the Chief of the Self-Liquidating Division of the RFC; that prior to or simultaneous with the disbursement of any funds the Agency Manager should receive written statements of an RFC engineer approving the purchase price of the equipment, that the construction against which disbursement was made had been completed in a manner satisfactory to him, and that the machinery, equipment and materials then acquired or contracted for against which the disbursement was then to be made had been acquired or contracted for at a price satisfactory to him.

The contract with Dorr was approved by the Chief of the Self-Liquidating Division of RFC. In the contract, Dorr agreed to furnish preliminary documents, and when these were approved, to furnish complete plans, specifications and drawings of the proposed construction. On June 11, 1943, Dorr completed its investigation and made a report to the Company in the form of a letter, in which it stated that the estimated cost of a 20-ton plant, after using existing building and equipment and by purchasing used equipment

---

3 Herein called Dorr.

where possible, was $894,000, and that the estimated operating cost would be approximately $176 per ton of $Al_2O_3$, after taking credit for six and one-half tons of $K_2SO_4$ produced. The RFC was informed of the contents of this letter and later was informed by the Company that Dorr had informed the Company that the plant would cost considerably more than originally contemplated, and that it would cost considerably more per ton to manufacture alumina than originally reported. Shortly thereafter Dorr withdrew from the project and H. K. Ferguson Company[4] was substituted with the consent and approval of RFC. In its contract, Ferguson stated that the estimated cost of the work, exclusive of engineering fees, was $371,000 and that the plant would be ready for utilization on or before December 1, 1943. The contract, however, contained this significant statement: "It is expressly understood that neither Owner nor Engineer-Contractor guarantees the correctness of either of these estimates." The contract with Ferguson also called for the furnishing of complete plans, specifications and estimates of costs.

Finally, on November 4, 1943, Ferguson submitted plans and specifications for a 40-ton plant at an estimated cost of $3,-342,429. It was also stated that if the process worked at all, the capacity of the plant would have to be increased to 100 tons per day in order to make it pay. Thereafter, studies were prepared by Ferguson with regard to the construction of a pilot test plant at an estimated cost of $721,909, plus $300,000 for working capital, and to liquidate the Company's existing indebedness, and also a study for the construction of a 100-ton plant at an additional cost of $7,250,000 if the pilot plant proved satisfactory. Mr. Macartney, the Chief of the Self-Liquidating Division of RFC, informed the officers of the Company that it would be necessary to go to the Board of Directors of RFC for these additional sums. Accordingly, on November 23, 1943, the Company addressed a letter to the RFC in the form of a request for the loan of approximately $1,000,000 for the pilot plant, and an additional loan of $7,250,000 for the 100-ton plant in the event that the pilot plant operated satisfactorily. Thereafter a complete report of the entire matter was made to the Board of Directors of RFC. This

report was attached to a letter dated December 10, 1943, from the Secretary of Commerce to the Chairman of the War Production Board. By this letter the War Production Board was informed of the requested amendment to the loan resolution and was asked to review the situation and advise the Secretary of Commerce respecting the wishes of the Board regarding further assistance to the Company. By letter dated December 22, 1943, the War Production Board advised the Secretary of Commerce that the Board desired to cancel its request made in its letter of March 26, 1943, and recommended that nothing further be done with the Company's project. Accordingly, on January 5, 1944, RFC wrote a letter canceling the proposed loan. This letter reviewed the entire history of the negotiations and concluded by stating: "The directors of this corporation also carefully reviewed this entire project in the light of present conditions and of your pending request for an increase in the loan. They concurred in the conclusions reached by the War Production Board and instructed the undersigned to advise you of the suspension of further disbursements of the loan authorized pursuant to resolution of May 13, 1943, as amended."

The Company contends that the Contract Settlement Act of 1944, 41 U.S.C.A. § 101 et seq., was applicable to the termination of its loan application and that the trial court was therefore without jurisdiction to proceed to a determination of the controversy. The Contract Settlement Act was passed between the time of the filing of the complaint and the answer and counter-claim. It may fairly be assumed that the Company did not have actual knowledge of the passage of this Act at the time it filed its pleading in the case. Shortly after the filing of its answer and counter-claim, it filed its application with the Contract Settlement Board for a settlement of the controversy and thereafter filed a motion in the District Court asking it to stay trial until the matter was determined by the Contract Settlement Board.

The loan was for the purpose of enabling the Company to put its property in condition to enable it to fulfill its contract with the Metals Reserve Company for the purchase of 50,000 tons of alumina, which

4 Herein called Ferguson.

was to be used for war purposes. We do not think it necessary to decide whether the commitment for the loan constituted a war contract such as would qualify the Company to come in under the Settlement Act. The Contract Settlement Board had jurisdiction under Section 103 of the Act of controversies arising out of terminations of war contracts by the Government for causes other than the default of the contractor. As will be pointed out hereafter, it is our conclusion that the Company was in complete default of performance on its commitments under the loan contract, and was therefore not qualified in any event to have its controversy determined under the provisions of that Act.

The trial court's judgment against the Company on its counter-claim was based on the ground that it had defaulted on its commitments under the loan resolution and that therefore the RFC was not required to complete the loan. The Company urges a number of assignments of error for reversal of the judgment. In the main, they present but a single question, namely, that it had met its requirements under the loan resolution, or, that if it had not strictly complied in all respects, the RFC had waived strict compliance therewith. All the assignments can be disposed of under a general discussion of this one main contention.

The RFC is not a charitable institution or an experimental laboratory. Its statutory duties require it to make loans on sound business principles. From the record it amply appears that all the parties understood that the loan was to be repaid from profits from the operation of the plant, and that the RFC was not required to make the loan until it was furnished with competent, expert evidence that the Moffat Process for producing alumina was practical and that a plant with a 40-ton capacity could be constructed for $480,000, which could operate in a competitive market at a sufficient profit to repay the loan. The feasibility of the Moffat Process is much in dispute. While Dean, of the Bureau of Mines, at first reported that the process had passed the experimental stage, in a later report he expressed doubt as to its practicability. Dorr did not approve it unqualifiedly. Ferguson doubted its practicability, as is

evidenced by its suggestion that something in excess of a million dollars be expended for a test plant of 5-ton capacity and that if and when this test plant was found satisfactory, that then a further sum in excess of seven million dollars be expended in the erection of a 100-ton capacity plant. No engineering firm was willing to certify and be bound by its certification that the contemplated plant could be constructed for $480,000. All the evidence is clearly to the contrary. No detailed plans and specifications for the construction of the plant were ever submitted to the RFC, and notwithstanding what is said by the Company, these requirements were not waived. It would serve no useful purpose for us to point out in detail the evidence which leads us to these conclusions, and would only extend this opinion to unjustified lengths.

Finally, it is urged that the RFC is estopped to charge that the Company failed to comply with the conditions of the loan resolution because it did not put its refusal to complete the loan on this ground, and that it may not now set them up as its reason for canceling the loan. Appellant cites a line of authorities which hold that where a party gives a reason for its conduct and decision touching a matter in controversy, he will not after litigation has begun be permitted to shift his position. It is not necessary to discuss those cases, because under the facts of this case they do not apply. The RFC did not assign any specific reasons for its cancellation of the loan. The letter of January 5, 1944, canceling the loan, reviewed in detail all that had gone before, including the conclusions of the War Production Board in regard to the entire transaction, and then stated that the Board of Directors had reviewed the entire project in the light of present conditions and of "your pending request for an increase in the loan", and concurred in the conclusions of the War Production Board, namely, that nothing further be done. This was merely the equivalent of stating that it had concluded to cancel the loan without assigning any specific reasons therefor. Under this situation, the RFC was free in any event to urge any defense available in opposition to the counter-claim.

Affirmed.